Eastern District of Kentucky
**F I L E D**

NOV 3 0 2021

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| United States of America, *ex rel.* Nam Nguyen and Misty Nall, | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| Blue Waters Assessment & Testing Services, LLC; Crossroads Counseling Services, Inc.; David Waters; and VerraLab JA, LLC, d/b/a BIOTAP MEDICAL, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. _____

**COMPLAINT WITH JURY DEMAND**
*Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)*

The Plaintiff, the United States of America, *ex rel.* Nam Nguyen and Misty Nall, by and through counsel, submit this Complaint against the Defendants, Blue Waters Assessment & Testing Services, LLC ("BATS"), Crossroads Counseling Services, Inc. ("Crossroads"), David Waters, and VerraLab JA, LLC, d/b/a BIOTAP MEDICAL ("Biotap") (collectively, "Defendants").

I.   **Introduction.**

1.      Nam Nguyen and Misty Nall are married and reside in Lexington, Fayette County, Kentucky. They are attorneys licensed to practice law in the Commonwealth of Kentucky. Nguyen and Nall primarily practice family law, representing individuals in divorce, custody, dependency, abuse-and-neglect, and related proceedings in the family court system, including the Fayette Circuit Court's Family Court Division.

2.      Nguyen and Nall bring this civil action on behalf of the United States of America pursuant to the *qui tam* provision within the False Claims Act, 31 U.S.C. § 3730(b)(1), against Defendants for violations of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

3.      Starting in or around 2019 and continuing through the present, BATS, Crossroads, and Waters knowingly submitted, caused to be submitted, and/or conspired to submit false claims to the Kentucky Medicaid program for reimbursement of urine drug testing services performed pursuant to court order and for other compliance and non-clinical purposes.

4.      Starting in or around April 2021 and continuing through the present, BATS, Crossroads, Waters, and Biotap knowingly submitted, caused to be submitted, and/or conspired to submit false claims to the Kentucky Medicaid program for reimbursement of urine drug testing services performed pursuant to court order and for other compliance and non-clinical purposes.

5.      The urine drug tests at issue in this action were performed pursuant to court order for individuals who were parties to or otherwise participating in actions pending in the family court system or participating in other court-supervised compliance programs, such as probation and home-incarceration programs. The urine drug tests were *not* ordered by medical professionals providing medical treatment, and they were *not* reviewed or used by medical professionals for purposes of medical diagnosis or treatment. In short, the subject court-ordered urine drug tests had no clinical basis and no medical necessity.

6.      The Kentucky Medicaid program only provides coverage for, and permits reimbursement to medical service providers for, urine drug testing *if* the testing is (a) ordered by a medical professional treating the individual for a specific illness or injury, (b) reasonable and necessary for the diagnosis or treatment of that injury or illness, and (c) conducted pursuant to the individual's particular needs.

-2-

7.      Conversely, the Kentucky Medicaid program specifically excludes coverage for court-ordered urine drug testing, which inherently is *not* conducted for clinical, or medical, purposes:

> **Section 3.** Exclusions. The department *shall not* reimburse for an independent laboratory or radiological service under this administrative regulation for the following services or procedures:
>
> *          *          *
>
> (4)      A court-ordered laboratory or toxicology test.

907 Ky. Admin. Regs. § 1:028(3)(4) (italics emphasis added).

8.      Defendants knew, recklessly disregarded, or deliberately ignored that urine drug testing performed pursuant to court order, or otherwise to ensure non-clinical program compliance, was not performed for purposes of medical diagnosis or treatment.

9.      Defendants knew, recklessly disregarded, or deliberately ignored that the medical professionals who signed the urine drug testing forms were not providing medical treatment to the individuals subject to testing and were not using the results of the urine drug tests for medical purposes.

10.     Nevertheless, Defendants submitted, caused to be submitted, and/or conspired to submit claims for the urine drug tests to the Kentucky Medicaid program. These claims were false because the tests were not medically necessary and not needed or used for purposes of medical diagnosis or treatment.

11.     As a result of the thousands upon thousands false claims submitted, caused to be submitted, and/or conspired to be submitted by Defendants, the Kentucky Medicaid program paid millions of dollars in reimbursements to which Defendants were not entitled.

II.     **Parties, Jurisdiction, and Venue.**

12.     Relators Nam Nguyen and Misty Nall are citizens and residents of the Commonwealth of Kentucky.

13.     The Plaintiff, the United States of America, *ex rel.* Nam Nguyen and Misty Nall, brings this action on behalf of the United States Department of Health and Human Services ("HHS") and, more specifically, one of its eleven operating divisions, the Centers for Medicare & Medicaid Services ("CMS").

14.     Defendant Blue Waters Assessment & Testing Services, LLC ("BATS"), is, and at all times relevant to this action was, a limited liability company organized and existing under the laws of the Commonwealth of Kentucky. BATS maintains its principal place of business in Lexington, Kentucky, and has conducted, and continues to conduct, business within this judicial district. BATS may be served with process via its registered agent, David Waters, at 409 West New Circle Road, Lexington, Kentucky 40511.

15.     Defendant Crossroads Counseling Services, Inc. ("Crossroads"), is, and at all times relevant to this action was, a corporation organized and existing under the laws of the Commonwealth of Kentucky. Crossroads maintains its principal place of business in Lexington, Kentucky, and has conducted, and continues to conduct, business within this judicial district. Crossroads may be served with process via its registered agent, David Waters, at 409 West New Circle Road, Lexington, Kentucky 40511.

16.     Defendant David Waters is, and at all times relevant to this action was, a citizen and resident of the Commonwealth of Kentucky. Upon information and belief, Waters is the sole member of BATS and the Chief Executive Officer and sole shareholder of Crossroads. Waters may be served with process at 409 West New Circle Road, Lexington, Kentucky 40511.

- 4 -

17.     Defendant VerraLab JA, LLC, is, and at all times relevant to this action was, a limited liability company organized and existing under the laws of the Commonwealth of Kentucky and operates under the assumed name of BIOTAP MEDICAL ("Biotap"). Biotap maintains its principal place of business in Louisville, Kentucky, and has conducted, and continues to conduct, business within this judicial district. Biotap may be served with process via its registered agent, Russell B. Scott Jr., at 716 West Main Street, Suite 100, Louisville, Kentucky 40202.

18.     This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("the Act"), and is brought by Nguyen and Nall pursuant to the Act's *qui tam* provision, 31 U.S.C. § 3730(b)(1). The Court may exercise subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1345.

19.     The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because one or more Defendants are either found or reside in, or have transacted business within, this judicial district. In addition, Defendants have engaged in acts proscribed by the Act within this judicial district.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a).

## III.    Legal Framework.

### A.    The False Claims Act, 29 U.S.C. § 3729 *et seq.*

21.     The False Claims Act was originally enacted in 1863 "when fraud, price gouging, and deliveries of defective weapons plagued the Union Army." Susan G. Fentin, Note, *The False Claims Act – Finding Middle Ground Between Opportunity and Opportunism: The "Original Source" Provision of 31 U.S.C. 3730(e)(4)*, 17 W. New Eng. L. Rev. 255 (1995). Most

recently amended in 1986, 2009, and 2010, the False Claims Act protects government funds against fraud. *Rainwater v. United States*, 356 U.S. 590 (1958).

22.     The False Claims Act prohibits a person from knowingly presenting, or causing to be knowingly presented, or conspiring to knowingly present, false or fraudulent claims for payment. *See* 31 U.S.C. § 3729(a)(1).

23.     Under the False Claims Act, a person acts with the requisite intent – "knowing" or "knowingly" – if he "has actual knowledge of the information[,]" "acts in deliberate indifference of the truth or falsity of the information[,]" or "acts in reckless disregard of the truth or falsity of the information[.]" *Id.* at § 3729(b)(1)(A). The Act, however, does *not* require a "specific intent to defraud." *Id.* at § 3729(b)(1)(B).

24.     Each violation of the Act carries civil penalties of not less than $5,000.00 and not more than $10,000.00 per false claim, "as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person."[1] *Id.* at § 3729(a)(1).

**B.     The United States Department of Health and Human Services, the Centers for Medicare & Medicaid Services, and The Kentucky Medicaid Program.**

25.     Title XIX of the Social Security Act of 1935, 42 U.S.C. § 1936 *et seq.*, created Medicaid, a federally-subsidized health insurance program administered by the states that provides coverage to, among others, the aged, the poor, and the disabled. The U.S. Department of Health and Human Services ("HHS"), by and through one of its eleven operating divisions, the Centers for Medicare & Medicaid Services ("CMS"), administers the Medicaid program at the federal level.

---

[1] Civil penalties assessed after June 19, 2020, for violations of the False Claims Act occurring after November 2, 2015, range from a minimum of $11,665.00 to a maximum of $23,331.00. *See* 85 Fed. Reg. 37004, 37006 (2020).

26.     In Kentucky, the Medicaid program was established pursuant to the Medical Assistance Act, KRS 205.510 *et seq.*, and operates pursuant to the administrative regulations set forth in Title 907, Chapters 1-23, of the Kentucky Administrative Regulations.

27.     Funding for the Medicaid program is shared between the federal government and the states, including the Commonwealth of Kentucky. The federal portion of Kentucky's Medicaid payments—the "Federal Medical Assistance Percentage"—is based on per capita income compared to the national average. At present, approximately 79.85% of each dollar spent by the Kentucky Medicaid program is contributed by the federal government.

28.     Medical service providers can enroll in and obtain Medicaid provider numbers, or National Provider Identifier numbers ("NPIs"). Upon enrollment, medical service providers may provide medical services to those insured through Medicaid—commonly referred to as "members"—and seek reimbursement for the services rendered.

29.     At all times relevant to this action, Crossroads, Waters, and Biotap held NPIs and were enrolled providers in the Kentucky Medicaid program.

30.     In order to enroll, Crossroads, Waters, and Biotap completed a lengthy application. *See* 907 Ky. Admin. Regs. § 1:672(2)(1)(c)(1); *see also* MAP-811 Enrollment Application (**Ex. 1**).

31.     The application for enrollment as a Kentucky Medicaid provider required the applicant—including Crossroads, Waters, and Biotap—to certify that it would comply with all applicable federal and state rules, laws, and regulations. *Id.* at p. 12.

32.     The application for enrollment as a Kentucky Medicaid provider further required the applicant—including Crossroads, Waters, and Biotap—to certify that any submission of a claim for reimbursement for services provided would comply with all applicable federal and state rules, laws, and regulations. *Id.* at pp. 11-12.

33.     The Kentucky Department of Medicaid Services contracts with various managed care organizations ("MCOs") to manage the care of Medicaid members. The MCOs receive payments from the Kentucky Medicaid program (which, in turn, is funded by nearly 80% by the federal government).

34.     Medical service providers must be enrolled with the MCOs to receive reimbursements for medical services rendered to Kentucky Medicaid members, who are enrolled in the MCOs' healthcare plans.

35.     At all times relevant to this action, Crossroads and Waters (and, upon information and belief, Biotap) were enrolled with the following MCOs, who in turn contracted with the Kentucky Medicaid program: Aetna Better Health of Kentucky Insurance Company, d/b/a Aetna Better Health of Kentucky; Anthem Health Plans of Kentucky, Inc.; Humana Kentucky Medicaid, n/k/a Humana Healthy Horizons; Molina Healthcare of Kentucky, Inc., d/b/a Passport Health Plan of Molina Healthcare; United Healthcare of Kentucky Ltd., d/b/a United Healthcare Community Plan of Kentucky; and Wellcare Health Insurance Company of Kentucky, Inc., d/b/a Wellcare of Kentucky, Inc.

**C.     Medicaid Cost-Sharing Requirements.**

36.     Cost-sharing is an integral part of the Medicaid program. Kentucky Medicaid members are required to share the cost for services received from treatment providers. *See* 907 Ky. Admin. Regs. § 1:604. As of January 1, 2019, all MCOs contracted with the Kentucky

- 8 -

Department for Medicaid Services are required to charge copayments, or copays, for services provided to Kentucky Medicaid members.

37.     For example, since no later than January 1, 2019, the copay for laboratory services, such as urine drug tests, has been $3.00 per test. (*See* Kentucky Medicaid Copay Policy Update for Providers at 4 (**Ex. 2**))

38.     In some instances, the copay requirement for Kentucky Medicaid members is waived. A member is not responsible for a copay, for example, if he or she has already met the annual cost-sharing limit. *See* 907 Ky. Admin. Regs. § 1:604(3)(1)(b).

39.     A copay is also effectively waived when a Kentucky Medicaid member cannot afford the copay, as a treatment provider cannot deny services to the member if the member's income is at or below 100% of the federal poverty level. (*See* Kentucky Medicaid Copay Policy Update for Providers at 2) Otherwise, a treatment provider may in some instances refuse services to a member who cannot afford the copay.

40.     If a Kentucky Medicaid member cannot afford a copay and the treatment provider cannot decline service, the treatment provider cannot consider the unpaid copay a debt. *See* 907 Ky. Admin. Regs. § 1:604(3)(6).

41.     In general, a copay waiver also occurs when a treatment provider is paid by an insurer, including MCOs contracted with the Kentucky Department of Medicaid Services, but chooses not to accept a copay. While a copay waiver can take several forms, one of the most common forms occurs when a treatment provider bills, but makes no attempt to collect, a copay.

42.    HHS's Office of Inspector General has identified several suspect behaviors indicative of an illegal routine copay waiver, such as representations or advertisements that Medicaid insurance will be accepted as payment in full for the service provided or that the treatment provider will not collect on any bills or invoices for copayments.

43.    A treatment provider's routine waiver of copays violates both the False Claims Act and Anti-Kickback Statute.

44.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits the knowing and willful offer, solicitation, payment, or receipt of "remuneration" to induce or reward patient referrals or the generation of business involving any service payable by, *inter alia*, Medicaid:

> Whoever knowingly and willfully solicits or receives [or offers or pays] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind— (A) in return for referring an individual to a person for the furnishing or arranging of the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.

42 USC 1320a-7b(b)(1), (2).

45.    "Remuneration" includes anything of value, including, but not limited to, cash. *Id.*

46.    A "Federal health care program" is defined to include Medicare, Medicaid, and the Kentucky Medicaid program. *Id.* at 1320a-7b(f).

47.    Compliance with the Anti-Kickback Statute is required for claims submitted through the Kentucky Medicaid program for reimbursement of provided services.

- 10 -

48.     In general, kickbacks in the healthcare setting can lead to a variety of undesirable outcomes, including overutilization of services, increased costs, and patient steering.

**D.     Urine Drug Tests.**

49.     Urine drug tests analyze an individual's urine for the presence of, *inter alia*, certain illegal drugs and prescription medications.

50.     Two types of urine drug tests are most commonly used: (a) immunoassay tests and (b) gas chromatography-mass spectrometry or liquid chromatography-mass spectrometry tests.

51.     Immunoassays are the most commonly used tests, as they are the quickest and most cost-effective. Immunoassays, often referred to as "screens," use antibodies to detect the presence of specific drugs or metabolites. In this way, immunoassays provide a "qualitative" result—*i.e.*, an indication of whether or not a drug class is found in the urine sample, provided that the concentration of the drug class in the sample exceeds a pre-set "cut off" threshold. For example, an immunoassay may have a cut-off level for oxycodone at 11 ng/mL. The immunoassay would simply reflect a "positive" or a "negative" if the tested individual's concentration of oxycodone in the urine sample was above or below 11ng/ML, respectively.

52.     Because immunoassays are qualitatively screening for drug classes, they lack specificity and, as a result, can yield false positives and false negatives. "Clinicians," therefore, "must obtain a comprehensive medication history of the patient, including over-the-counter medications, herbals, and supplements." (*See* Mena Raouf, PharmD, *A Practical Guide to Urine Drug Monitoring*, Federal Practitioner Vol. 35:4 (April 2018))[2]

---

[2] Available, and last accessed on November 16, 2021, at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6368048/#.

53.     Gas     chromatography-mass     spectrometry     (GC-MS)     and     liquid chromatography-mass spectrometry (LC-MS) tests can detect a wider range of drugs, are more reliable, and are often used to "confirm" results from an immunoassay; as such, they are also more expensive. GC-MS and LC-MS tests also provide a "quantitative" result—*i.e.*, an actual numerical concentration of a particular drug found in the sample. For example, a LC-MS confirmation test would provide the specific numeric concentration of oxycodone in the tested individual's urine sample.

54.     After an initial screen, or immunoassay, positive results need not automatically be subjected to confirmation, or chromatography, testing. Conversely, after an initial screen, or immunoassay, negative results need not automatically rule out, or preclude, further confirmation, or chromatography, testing. What is most important, rather, is the clinical evaluation of the treating medical provider that ordered the testing and the totality of the circumstances relating specifically to the patient.

**E.     Kentucky Medicaid Regulations Governing Urine Drug Tests.**

55.     The Kentucky Medicaid program reimburses medical treatment providers for clinical laboratory tests, including urine drug tests, if the tests meet initial coverage requirements:

> **Section 2.** Coverage. (1) The department[3] shall reimburse for a procedure provided by an independent laboratory if the procedure:
>
> * * *
>
> (c)     Is prescribed in writing or by electronic request by a physician, podiatrist, dentist, oral surgeon, advance registered nurse practitioner, or optometrist[.]

907 Ky. Admin. Regs. § 1:028(2)(1)(c).

---

[3] The Department for Medicaid Services. 907 Ky. Admin. Regs. 1:028(1)(5).

56.     Even then, the Kentucky Medicaid program will only reimburse medical treatment providers for services that are medically necessary. *See, e.g.,* 907 Ky. Admin Regs. § 3:005(3)(1)(a) (stating that, "[t]o be covered by the department, a service shall be . . . medically necessary").

57.     A determination of medical necessity, in turn, is "based on an individualized assessment of the recipient's medical needs[.]" *Id.* at § 3:130(2)(a). That is, the medical service for which reimbursement is sought must be, among other things:

> (1)     [r]easonable and required to identify, diagnose, treat, correct, cure, palliate, or prevent a disease, injury, disability, or other medical condition[;]"
>
> (2)     [a]ppropriate in terms of the service, amount, scope, and duration based on generally accepted standards of good medical practice; [*and*]
>
> (3)     [p]rovided for medical reasons rather than primarily for the convenience of the individual, the individual's caregiver, or the health care provider, or for cosmetic reasons[.]"

*Id.* at § 3:130(2)(b).

58.     The Kentucky Medicaid program explicitly prohibits coverage of or reimbursement for clinical laboratory tests, such as urine drug tests, that are ordered by a court:

> **Section 3.** Exclusions. The department *shall not* reimburse for an independent laboratory or radiological service under this administrative regulation for the following services or procedures:
>
> *            *            *
>
> (4)     A court-ordered laboratory or toxicology test.

*Id.* at § 1:028(3)(4) (italics emphasis added).

59.     The Cabinet for Health and Family Services ("CHFS" or "the Cabinet") issued a urine drug testing policy effective July 1, 2020. (*See* CHFS Drug-Testing Policy (**Ex. 3**)) Under the policy, all "[d]rug testing should be individualized based on the specific patient's clinical needs." *Id.* The Cabinet further requires providers to document the "rationale for each [urine drug test]" ordered," "the result of the [urine drug test]," and the "clinical decision made based on the [urine drug test]." *Id.*

60.     The MCOs that manage the care of Kentucky Medicaid members have issued similar coverage guidelines.

61.     Wellcare, for instance, has adopted guidelines identical to the policy issued by the Cabinet. (*See* Wellcare Claims and Payment Policy: Drug Testing (Kentucky) at 1 (**Ex. 4**)) The guidelines similarly require that all "[d]rug testing should be individualized based on the specific patient's clinical needs" and that providers document the "rationale for each [urine drug test]" ordered," "the result of the [urine drug test]," and the "clinical decision made based on the [urine drug test]." *Id.*

62.     Aetna likewise sets forth guidelines for the coverage of and reimbursement for urine drug testing. In general, Aetna considers urine drug testing medically necessary in certain cases, such as for "persons in chronic pain programs or substance use disorder programs." (*See* Drug Testing in Pain Management and Substance Use Disorder Treatment at 1 (**Ex. 5**)) In these cases, "drug testing should be individualized to test for substances only specific to the individual member's plan of treatment." *Id.* at 2. Further, "[c]linical documentation must specify how the test results will be used to guide clinical decision making." *Id.* In compliance with Kentucky's administrative regulations, however, "Aetna considers testing ordered by or on behalf of third parties (e.g., courts, school, employment, sports and recreation, community extracurricular

activities, residential monitoring, marriage licensure, insurance eligibility) *not medically necessary* treatment of disease." *Id.* (emphasis added).

63.     Humana requires that all urine drug tests be ordered on an individualized basis "based on the member's unique clinical presentation[.]" (*See* Humana Drug Testing Medical Policy Statement – Kentucky Medicaid at 3 (**Ex. 6**)) All orders for urine drug testing, therefore, must include "the type of test to be performed[,]" the "drug and drug class to be tested[,]" the "[c]linical indication[,]" and the signature of "a qualified provider." *Id.* Humana also specific excludes from coverage urine drug tests "required by a third party such as the following: . . . [m]edico-legal[.]" *Id.* at 9-10.

## IV.     Factual Allegations.

### A.     BATS, Crossroads, and/or Waters Secure Urine Drug Testing Services Through Illegal Kickbacks.

64.     Starting in approximately 2007, the Lexington-Fayette Urban County Government Department of Community Corrections managed and operated a Community Alternative Program ("CAP"), under which regular urine drug testing was conducted as part of a probation and home-incarceration program designed to benefit the local court system and the Cabinet, whose agencies and employees served as advocates for the participants in the program. The urine drug tests were ordered by the Cabinet and paid for by the Cabinet, in part, and CAP participants, in part.

65.     In or around early 2019, Waters, through Crossroads and/or BATS, took over all urine drug testing conducted under CAP. According to Waters,

> CAPS did not routinely use a confirmation process unless the client paid $50 first. Typically, if CAPS reported a positive result it was accepted as valid without the appropriate and ethical confirmation unless requested and paid for specifically by the client. The

"independent lab" in that instance was simply a confirmation lab. Their's was a <u>one-step process</u> with an option for second step."

(*See* October 20, 2021, Email from Waters (**Ex. 7**) (underlined emphasis original)

66.     Waters sensed an immediate opportunity. Knowing that nearly all, if not all, CAP participants were covered through an MCO contracting with the Kentucky Medicaid program, Waters could use his professional counseling company, Crossroads, to take over all urine drug testing and submit the invoices, or claims, to the Kentucky Medicaid program. Waters created BATS to manage the sample collection processes. (*See, e.g.,* Kentucky Secretary of State General Business Information for BATS, noting an incorporation date of April 12, 2019 (**Ex. 8**); *see also* June 10, 2019, Email from Waters regarding the switch from CAP to BATS (**Ex. 9**))

67.     Waters was able to sell this opportunity rather easily to the Cabinet, the agency "ordering" and paying for the urine drug tests, as submitting claims for the urine drug testing to the Kentucky Medicaid program meant that the Cabinet would no longer need to pay for the tests.[4]

68.     This naturally led to Waters securing an arrangement to conduct the urine drug testing pursuant to orders issued by the Fayette, Jessamine, and Scott Family Courts (and perhaps other Family Courts sitting in adjacent counties), as the individuals who were parties to or otherwise participating in family court proceedings (such as divorce, custody, DNA, dependency, abuse-and-neglect, and related matters) were generally likewise working with the same advocates employed by the Cabinet.

---

[4] *See also* November 8, 2021, Email from Amber Lambert, MSW, FSOS, to Waters, in which Lambert, a Family Services Office Supervisor for the Cabinet, refers to BATS' "new billing system," under which "[t]he Cabinet will no longer be billed for drug screening. (**Ex. 10**) Instead, pursuant to the scheme that Defendants put in place, "the client's insurance [*i.e.,* Medicaid] will cover the test or there will be no charge." *Id.*

69.     BATS, Crossroads, and Waters needed a clinical laboratory to analyze the urine samples. Initially, BATS, Crossroads, and/or Waters contracted with LabTox, LLC. Under this arrangement, BATS collected the urine samples and sent them to LabTox for analysis.

70.     On December 7, 2020, Waters sent an email to various "stakeholders" – individuals employed by or working with the court system and the Cabinet and its agencies – to address concerns raised over the reliability of LabTox. (*See* December 7, 2020, Waters Email (**Ex. 11**)) More specifically, Waters stated that the $2.1 million settlement that LabTox reached with the federal government over miscoding by its contracted medical biller did not in any way shake his "high[] confidence" in LabTox. *Id.* at 2. Waters attached a communication from an attorney for LabTox purporting to explain the miscoding issue and another communication from the Cabinet's Office of Inspector General generally praising LabTox's survey results. *Id.* 2, 7-8.

71.     Notwithstanding Waters' confidence in LabTox and the representations of an attorney and the Cabinet's Office of Inspector General, the relationship between BATS, Crossroads, and Waters and LabTox ceased in or around April 2021.[5]

72.     In April 2021, again in need of a clinical laboratory to continue conducting urine drug testing, BATS, Crossroads, and Waters turned to Biotap to perform all chromatography, or confirmation, testing. (*See* April 27, 2021, Memorandum from Waters at 1 (**Ex. 12**))

73.     Because Biotap did not perform immunoassays, or screens, Waters again sensed an opportunity. In June 2021, BATS and Crossroads began operating their own "screening lab" to conduct all immunoassays. *Id.* at 1; *see also* August 3, 2021, Memorandum from Waters at 1 (**Ex. 13**). Under this arrangement, BATS continued to manage the collection processes and

---

[5] The United States of America has since filed an Intervening Complaint against LabTox, LLC, and its Chief Executive Officer, Ron Coburn, and its Operations Supervisor and Compliance Officer, Erica Baker, for alleged violations of the False Claims Act. *See United States of America ex rel. Caitlin Secamiglio v. LabTox, LLC, et al.*, Civil Action No. 5:20-cv-305-DCR (DN 21).

Crossroads operated the lab. *Id.* In an October 20, 2021, email from Waters to stakeholders, he clarified that Biotap actually managed the screening lab, stating that "BioTap is . . . contracted to manage the screening lab for Crossroads. . . . It is essentially a Bio Tap lab run by their staff and supervised by their scientists, but operated by Crossroads." (*See* October 20, 2021, Email from Waters)

**B.      Defendants Prepare Orders for the Cabinet to Complete and the Courts to Enter Requiring Urine Drug Testing.**

74.      In general, an advocate employed by the Cabinet, such as a social worker, will require that an individual submit to urine drug testing. In the family court system, the advocate will work with the attorneys for the parties to ensure an appropriate court order is entered.

75.      To ensure that the Cabinet and, in turn, the courts referred all urine drug testing to BATS (and, in turn, to Crossroads and to the lab contracted to analyze the urine samples, first LabTox and presently Biotap), BATS created a template order to be completed by the Cabinet and submitted to the court, through the parties, for entry. The orders commonly used in and after April 2020 set forth the frequency of the required testing (as determined by the social worker and as approved by the court), the party responsible for payment of the testing, and the type of test that would be performed:

> 1.      Each and every time the individual being tested goes to BATS to be tested, that individual MUST bring his or her photo identification and $20 Collection Cup Fee (cash or card only), unless payment is specifically Ordered to be paid by the Cabinet or DYS in paragraph 2 below. Individual is also asked to bring their insurance card to cover the lab cost. If insurance doesn't cover this cost, the individual will NOT be billed. This provides for a 60-panel drug & alcohol screen using LCMS analysis, with qualitative/quantitative report next business day.

(*See* April 2020 Proposed Order (**Ex. 14**) and November 2020 Proposed Order at ¶ 1 (**Ex. 15**))

76.     The language in the proposed orders has changed over time. For example, in late August 2021, BATS revised the proposed order for the Cabinet to complete and the courts to enter. (*See* August 2021 Proposed Order (**Ex. 16**)) In this latest iteration, the order provides as follows:

1.     Individual being tested at BATS MUST bring a photo identification and up-to-date insurance card.

2.     Any costs associated with the drug screenings shall be paid for by client's insurance or by client if either there is no insurance or the insurer denies coverage of the service. **All persons showing up to test with either no insurance, invalid insurance, or who choose not to use their insurance will be charged a $20 collection fee payable prior to the test.**

3.     BATS program policies & procedures must be followed as required or testing may be suspended and referred back to Court.

* * *

8.     Results of these tests shall be released to the Fayette Family Court and the Fayette County Attorney for *court purposes only.*

*Id.* (bold emphasis original; italics emphasis added).

77.     The proposed orders contain blanks on which the Cabinet (and, effectively, the Court) enter the number of urine drug tests required pursuant to the order. For instance, on the November 2020 and August 2021 proposed orders, there are options for one test ("Immediately only"); one test and then perhaps another at a later time ("Immediately only and then randomly when requested to do so by the: CABINET / DYS (*circle one*)); or as many as three tests per week after an immediate test pursuant to a "phase." (*See* November 2020 Proposed Order and August 2021 Proposed Order)

78.    While the proposed orders that BATS prepared specifically reference the Fayette Family Court and the Fayette County Attorney, the same orders are being used by the Jessamine Family Courts and the Scott Family Courts, for both of whom Defendants are also providing urine drug testing. (*See* Undated Text Message (confirming Jessamine Family Courts' referral of urine drug testing to BATS) and November 17, 2021, Amber Lambert Email (confirming Scott Family Courts' referral of urine drug testing to BATS) (**Ex. 17**))

79.    The exact number of urine drug tests that have been performed by Defendants pursuant to court order or CAP compliance requirements is unknown. However, records produced by the Cabinet reveal as many as, if not more than, 70,271 urine drug tests.

**C.    Having Secured Urine Drug Testing, BATS, Crossroads, and Waters, and later Biotap, Concoct a Fraudulent Scheme to Create a Sham Basis for Submitting Otherwise False Claims.**

80.    Defendants knew of but recklessly disregarded or deliberately ignored the medical-necessity requirements for submitting claims to the Kentucky Medicaid program for urine drug testing.

81.    Defendants knew of but recklessly disregarded or deliberately ignored the Kentucky Medicaid program's explicit prohibition of coverage and reimbursement for urine drug testing performed pursuant to a court order.

82.    Defendants knew of but recklessly disregarded or deliberately ignored each MCO's explicit prohibition of coverage of and reimbursement for urine drug testing performed pursuant to a court order.

83.    To skirt the express medical-necessity regulatory requirements and the coverage and reimbursement exclusions for court-ordered (or medico-legal, non-clinical) urine drug testing, Defendants concocted a scheme to fraudulently "meld" the forensic and the clinical

- 20 -

to create a sham basis for submitting, or causing to be submitted, otherwise false claims to the Kentucky Medicaid program.

84.    In addition, Defendants intentionally, deliberately, or recklessly overutilized the more expensive chromatography, or confirmation, testing, and underutilized the less expensive immunoassay testing.

85.    Finally, Defendants were able to create, pursue, and profit from their fraudulent scheme because of the illegal kickbacks they offered to the Cabinet and the individuals subjected to urine drug testing.

### 1.    BATS, Crossroads, and Waters seek to turn the forensic into the clinical, creating a sham clinical basis for false claims.

86.    The Kentucky Medicaid program's regulatory framework is abundantly clear: urine drug tests are only covered for reimbursement if there is a medical necessity and the medical professional ordering the urine drug tests intends to use the results of the test for clinical purposes, *i.e.*, diagnosis or treatment of the individual being tested.

87.    Given the medical-necessity and individual-specificity requirements for coverage of and reimbursement for urine drug tests, the explicit exclusions for court-ordered and other non-clinical drug testing from coverage and reimbursement make complete sense.

88.    Make no mistake, there is nothing clinical about court-ordered urine drug testing. The orders that BATS prepared as part of its and Defendants' effort to secure and maintain urine drug testing services openly admits the non-clinical nature of the service: "[r]esults of these tests shall be released to the Fayette Family Court and the Fayette County Attorney *for court purposes only*." (*See* April 2020 Proposed Order at ¶ 6; November 2020 Proposed Order at ¶ 6; and August 2021 Proposed Order at ¶ 6 (emphasis added))

89.     In addition, Waters has made clear that the urine drug tests that BATS, Crossroads, and Biotap are performing do not cater to the particular needs of the individual being tested. For instance, in an October 20, 2021, email, Waters openly admitted that, with respect to immunoassays, the court-ordered urine drug testing is designed with the community, not the individual, in mind: "[w]e picked the ten drugs, including alcohol, based on a survey of 18-months of tests and what were the most prevalently positive in that survey sample. This is the best representation of what our community is using." (*See* October 20, 2021, Email from Waters)

90.     Recognizing that court-ordered drug tests are not clinical, Defendants needed to skirt the clear regulatory requirements for coverage of and reimbursement for claims for urine drug tests and the despite the similar coverage and reimbursement guidelines issued by the MCOs contracting with the Kentucky Medicaid program. To do so, BATS, Crossroads, and Waters, and later Biotap, created a scheme to "meld" the forensic and the clinical.

91.     Waters has repeatedly reiterated that, "[s]ince the beginning of our drug testing efforts we've sought to *meld* the forensic and the clinical such that urine drug screens take on a clinically meaningful role in the treatment and case management of our mutual clients[.]" (*See* November 8, 2021, Email from Waters at 1 (**Ex. 18**) (emphasis added))

92.     Waters has insisted that "the issues [surrounding court-ordered urine drug testing] are overwhelmingly clinical in nature and deserve a clinical response." (*See* April 27, 2021, Memo from Waters at 2) "The more clinical services our clients are connected to," Waters continued, "the greater the chance we can effect a reduction in recidivism and hopefully break the insidious generational cycles we so often see." *Id.* Thus, **"[c]onnecting the Court-ordered testing to clinical services from the get-go seems a relatively new approach, but on that will likely pay dividends for the community in the long run."** *Id.* (emphasis added). Waters'

approach is not "relatively new," it's illegal. And the "dividends" aren't to the community; they are to BATS, Crossroads, Waters, and Biotap.

93.     To ensure there was a clinical element, despite the fact that a court ordered an individual to submit to urine drug testing, Waters requires every individual subject to court-ordered testing "to complete an intake that now includes a brief interview with our clinical provider in support of understanding their needs and goals." (*See* November 8, 2021, Email from Waters at 2) Significantly, this mandatory "intake" "often gets accomplished *later*," or after the urine drug test, "by phone or telehealth." *Id.* (emphasis added).

94.     Based on Waters' representation in the November 8, 2021, email, this arrangement wasn't always the case. For instance, at least one individual, M.S., subject to court-ordered urine drug testing did not submit to any intake process with or clinical evaluation by a provider with Crossroads. Nevertheless, M.S. was still diagnosed as suffering from at least one mental health condition simply to justify the claim submitted, or caused to be submitted, by Waters, BATS, Crossroads, and/or Biotap for urine drug testing.

95.     Thus, various medical treatment providers diagnosed individuals subject to court-ordered urine drug testing with various mental health conditions in an effort to backdoor a clinical basis for the claims submitted urine drug tests. (*See, e.g.,* Spreadsheet Produced by the Cabinet for Health and Family Services in Response to Open Records Request (ORR 21-513) Seeking Claims Submitted by BATS for Urine Drug Tests Performed Pursuant to Order of the Fayette Family Court (stating, in columns "V," "W," "X," and "Y" the diagnoses of individuals subject to court-ordered testing as determined by the "provider" identified in column "AX") (**Ex. 19**))

96.     In other words, Defendants knew that court-ordered urine drug tests (a) were not medically necessary, (b) were not clinical in nature, and (c) were not covered by or reimbursable under the Kentucky Medicaid program. So, Defendants create a sham provider-patient relationship with each individual subject to court-ordered urine drug testing to backdoor a faux clinical basis for submitting claims for reimbursement for the urine drug tests performed.

97.     Most recently—and most likely because no intake and no evaluations of any sort were being conducted, as M.S. represents—this sham provider-patient relationship has become "required." The latest proposed order prepared by BATS for entry by the Fayette Family Court (and several other family courts), states that "BATS program policies & procedures *must* be followed as required or testing may be suspended and referred back to Court." (*See* August 2021 Proposed Order at ¶ 3) In other words, if an individual subject to court-ordered urine drug testing fails, refuses, or otherwise opts to not participate in the provider-patient intake process with Crossroads, BATS can refuse to conduct the urine drug testing. Given that these individuals may be required to undergo urine drug testing in order to, *inter alia*, maintain custody of or preserve visitation rights with their children, this requirement is one these individuals simply will not ignore.

### 2.     Defendants openly despise immunoassays and overutilize chromatography testing in order to inflate the number of claims and amount of reimbursements.

98.     BATS, Crossroads, and Waters were not pleased with the need to create and operate a screening lab. Waters has made no secret of his distaste for immunoassays, repeatedly stressing his preference that all urine samples be subjected to the "more expensive" chromatography, or confirmation, testing. (*See* August 3, 2021, Memorandum from Waters at 1; *see also* April 27, 2021, Memorandum from Waters ("[u]ltimately, we'd prefer all tests continue

to go only to the confirmation lab"); October 20, 2021, Email from Waters ("[a]s I've said many times before, I'd prefer to send every sample straight to confirmation testing") Waters, of course, knew that he couldn't do so based on unspecified "Medicaid rules." (*See* August 3, 2021, Memorandum from Waters at 1; *see also* October 20, 2021, Email from Waters)

99.     According to Waters, BATS, Crossroads, and LabTox and Biotap enjoyed "carte blanche" to submit all urine samples through chromatography, or confirmation, testing during the COVID-19 pandemic. (*See* August 3, 2021, Memorandum from Waters at 1; *see also* April 27, 2021, Memorandum from Waters at 1 ("[u]ltimately, we'd prefer all tests to go only to the confirmation lab, but Medicaid will not allow this past the current COVID emergency"); August 3, 2021, Memorandum from Waters at 1 ("[t]he COVID emergency saw a loosening of those rules, but there are beginning to come back. Hence, the need for more screening"); October 20, 2021, Email from Waters ("Medicaid rules prohibit [confirmation testing for all urine samples] based on cost, and open-ended confirmations are not allowed"))

100.     The governing regulations, however, did not stop Defendants from overutilizing chromatography, or confirmation, testing.

101.     Without any clinical basis or any individualized assessment of an individual's particular needs, Defendants automatically submit the urine samples of "[a]ll new intakes[,]" or individuals testing with BATS for the first time pursuant to court order, "for confirmation[.]" (*See* April 27, 2021, Memorandum from Waters at 1; *see also* August 3, 2021, Memorandum from Waters at 2)

102.   Without any clinical basis or any individualized assessment of an individual's particular needs, condition, or situation, Defendants also randomly selected a urine sample "at least once per month" for additional confirmation testing, "regardless of positive screens." (*See* April 27, 2021, Memorandum from Waters at 2)

103.   Without any clinical basis or any individualized assessment of an individual's particular needs, condition, or situation, Defendants automatically submit the urine samples of those individuals for whom "*any* positive shows" on their immunoassay to confirmation testing. (*See* August 3, 2021, Memorandum from Waters at 2)

104.   This automatic "reflex," as Waters calls it, is further done, as its name implies, without any individualized assessment. (*See* August 3, 2021, Memorandum from Waters at 2) For instance, the prescription medication Xanax is a benzodiazepine. An immunoassay that reveals a positive result for benzodiazepines may or may not require automatic "reflex," or submission, to confirmation testing for an individual that took Xanax under prescription from his physician.

105.   This practice of automatically submitting any positive immunoassay to confirmation testing (without any clinical need or individualized assessment) is particularly troubling given that BATS, Crossroads, and Waters set up the screening lab "with the lowest available cut-offs." (*See* October 20, 2021, Email from Waters) Waters explains that "[s]creening is the process by which we evaluate samples initially[.]" *Id.* A cut-off is "the lowest concentration level that a given [immunoassay] test will report a positive." *Id.* "Every lab scientist must determine cut-offs[, as t]here is no standard across all labs, but only what the lab is comfortable being able to achieve." *Id.* To reduce or eliminate false positives, "[s]creening cut-offs are naturally higher," but Defendants intentionally set up their screening lab "with the lowest available cut-

offs." *Id.* This effectively ensures that as many immunoassays as possible can report positive results and, therefore, get automatically "reflexed" to the more expensive confirmation testing.

106. Further, Defendants automatically "reflex" immunoassays to confirmation testing "if there is suspicion *regardless* if the screen is negative." *Id.* at 2 (emphasis added).

107. Since the COVID-19 pandemic began, Defendants have eschewed protocols for responsible urine drug testing. Instead, Defendants have underutilized immunoassay tests and overutilized chromatography tests. Waters, in fact, has openly admitted to this practice. In April 2021, Waters stated that, [d]ue to the COVID emergency the Medicaid rules [limiting the number of confirmation tests per individual per year] were relaxed and *there were no limits*." (*See* April 27, 2021, Memorandum from Waters at 2) "Ultimately," Waters continued, "we'd prefer all tests to *continue to go only to the confirmation lab*, but Medicaid will not allow this past the current COVID emergency. So we have to have both systems [the BATS/Crossroads screening lab and the Biotap confirmation lab] working in tandem." *Id.* at 1 (emphasis added).

108. On August 3, 2021, Waters reiterated, "Confirmation testing is more expensive and Medicaid doesn't want to pay for it and therefore caps how many confirmations are available per patient. The COVID emergency saw a loosening of those rules, but they are beginning to come back. Hence, the need for more screenings." (August 3, 2021, Memorandum from Waters at 1)

109. In other words, Defendants used the strain, hardship, and administrative issues facing the state and federal governments, including the Kentucky Medicaid program, to overutilize chromatography, or confirmation, tests in order to submit higher-valued claims for reimbursement.

- 27 -

110.    The proposed orders requiring urine drug tests that BATS prepared that was commonly used on and after April 2020 specifically provided that all urine samples be subjected to confirmation testing: "a 60-panel drug & alcohol screen using LCMS analysis, with qualitative/quantitative report next business day." (*See* April 2020 Proposed Order at ¶ 1; *see also* November 2020 Proposed Order at ¶ 1 (calling for a qualitative/quantitative report within 2-3 business days))

   3.    **Defendants secure drug-testing services through illegal kickbacks, such as cost savings to the Cabinet and the waiver of copayments to individuals subject to court-ordered testing.**

111.    Waters has admitted that "[t]he vast majority of our clients use Medicaid." (*See* April 27, 2021, Memorandum from Waters at 2) A more specific figure, according to Waters, is 95%. (*See* August 3, 2021, Memorandum from Waters at 1)

112.    Again, however, Waters knew that he had to create a faux clinical basis for the urine drug testing in order to submit claims for reimbursement through the Kentucky Medicaid program.

113.    So Waters, through Crossroads, "employ[ed] a nurse (APRN) to medically evaluate and coordinate treatment of our test clients." (*See* October 20, 2021, Email from Waters) Importantly, this alleged evaluation came *after* the courts ordered the urine drug testing and, in most cases, *after* the individual provided a urine sample for testing. (*See, e.g.,* November 8, 2021, Email from Waters at 2 (stating that the "intake . . . is often accomplished later," or after the drug test, "by phone or telehealth"))

114.    Waters admitted that, by creating this sham clinical basis – indeed, a provider-patient relationship he, BATS, and Crossroads require individuals, by court order, to form with them – **"has . . . enabled [Defendants] to charge insurance, primarily Medicaid, for the**

**lab services which are costly to operate, and in turn pass those cost savings on to the Cabinet."** (*See* October 20, 2021, Email from Waters (emphasis added))

115.   This scheme violates the Anti-Kickback Statute, as Waters, BATS, and Crossroads, and later Biotap, have effectively offered a kickback, bribe, or rebate to the Cabinet in exchange for referrals, or arrangements for referrals, for urine drug testing for which Defendants later submit claims for reimbursement to the Kentucky Medicaid program for providing.

116.   In addition, Defendants have made it abundantly clear that individual copays are routinely waived.

117.   In the April 2020 and November 2020 proposed orders prepared by BATS, no copay is required. (*See* April 2020 Proposed Order and November 2020 Proposed Order) Instead, the individual was required to bring a $20 "Collection Cup Fee" unless the Cabinet was required to pay for the test. *Id.* at ¶ 1. An individual was also required to bring his or her insurance card "to cover the lab cost," but this "cost" was never "billed" if the individual's insurance did not cover the "cost." *Id.*

118.   In the August 2021 proposed order prepared by BATS, no copay is required. (*See* August 2021 Proposed Order) Instead, an individual must bring a photo identification and an up-to-date insurance card. *Id.* at ¶ 1. "Any costs associated with the drug screenings," however, "shall be paid for by client's insurance or by client if either there is no insurance or the insurer denies or excludes coverage of the service." *Id.* ¶ 2. Further, those individuals with no insurance or "invalid insurance," or for those who choose not to use their insurance, are charged a $20 "collection fee." *Id.*

119.   Because Defendants knew that the "vast majority," or "95%," of the clientele was insured by Medicaid, the representations regarding lab costs and collection fees are, at least implicitly, entirely illusory. But Waters has made it absolutely explicit that Defendants will never attempt to collect any copays, fees, or other costs.

120.   In April 2021, Waters represented that "the lab will bill clients who don't have insurance to cover the lab costs. There is no mechanism for collection and unpaid bills will not be reported. This is a Medicaid compliance issue." (*See* April 27, 2021, Memo from Waters at 1)

121.   Waters repeated the effective copay waiver:

> BIOTAP has been sending bills where there is no insurance to cover lab costs. Medicaid requires the billing of all clients using the same service. Clients who don't have or provide insurance will receive a bill from either BIOTAP or Crossroads for the lab work and to keep in compliance. **However, neither agency employs collection efforts and the bills will not be reported if not paid**."

*Id.* at 2.

122.   Waters was even more explicit in August 2021, stating that the $20 "test fee" was being eliminated because "lab costs will be paid for by insurance." (*See* August 3, 2021, Memo from Waters at 1)

123.   Water further stated that, "[f]or those individuals who either don't [have insurance], won't [use insurance], or who's insurance doesn't cover, we will need to bill them for lab services. . . . ***There will never be a collection process*** nor credit reporting if a bill is unpaid." *Id.* at 1. Waters even stated that the BATS staff "are always available to help those who qualify to access Medicaid and we have helped many to do this already." *Id.*

- 30 -

124.    Most recently, on November 8, 2021, Waters stated that "90% of our clients have Medicaid and we have to bill the rest in order to maintain compliance," and he again admitted that "[t]here are no collections[.]" (*See* November 8, 2021, Email from Waters)

125.    Thus, Defendants regularly represented and advertised that they waived copays for urine drug tests.

126.    Routine waivers of copays violate the False Claims Act for several reasons. First, the Kentucky Medicaid program does not pay for claims induced by illegal kickbacks. Thus, claims induced by the violation of the Anti-Kickback Statute are false under the False Claims Act. Second, Defendants effectively misrepresent to the Kentucky Medicaid program the cost of the urine drug tests performed because they are reporting that the actual charge for the urine drug test is higher than it should be because they have waived all copays from the individuals subject to court-ordered testing.

## V.    Legal Causes of Action.

127.    Under the False Claims Act, a "claim" includes "any request or demand . . . for money . . . that[] . . . is made to a contractor, grantee, or other recipient, if the money . . . is . . . to advance a Government program or interest, and if the United States Government[] . . . will reimburse such contractor, grantee, or other recipient for any portion of the money . . . which is requested or demanded[.]" 31 U.S.C. § 3729(b)(2)(A).

128.    As such, claims submitted or caused to be submitted by BATS, Crossroads, Waters, and Biotap to the Kentucky Medicaid program through MCOs are "claims" under the False Claims Act.

129.    BATS, Crossroads, and Waters have knowingly submitted, caused to be submitted, and/or conspired to submit thousands upon thousands of false or fraudulent claims for urine drug tests performed pursuant to orders of the Fayette Family Court from April 2019 to the present. Biotap has knowingly submitted, caused to be submitted, and/or conspired to submit, thousands upon thousands of false or fraudulent claims for urine drug tests performed pursuant to orders of the Fayette Family Court from April 2021 to the present.

130.    Within the applicable limitations period, Defendants have knowingly submitted, caused to be submitted, and/or conspired to submit false or fraudulent claims for urine drug tests performed pursuant to orders of the Jessamine Family Court and Scott Family Court.

131.    BATS, Crossroads, and Waters have knowingly submitted, caused to be submitted, and/or conspired to submit false or fraudulent claims for urine drug tests performed pursuant to CAP compliance requirements from 2019 to the present. (*See* August 3, 2021, Memorandum from Waters at 2 (stating that "we are currently running all LFUCG Adult Probation samples through this process [*i.e.*, the same process through which Defendants are running all urine samples ordered by the family courts]). Biotap has knowingly submitted, caused to be submitted, and/or conspired to submit false or fraudulent claims for urine drug tests performed pursuant to CAP compliance requirements from April 2021 to the present.

132.    As a direct and proximate result of Defendants' fraudulent actions and conduct, the Kentucky Medicaid program, which is nearly 80% funded by federal monies, has paid to Defendants millions of dollars upon the submission of thousands of false claims for urine drug tests that were not clinical in nature, not supported by any medical necessity, not catered to an individual's particular medical needs, and, thus, not covered by and not subject to reimbursement through the Kentucky Medicaid program.

A.     **Count I: Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).**

133.    Defendants knowingly presented, or caused to be presented, thousands upon thousands of false or fraudulent claims for payment to the Kentucky Medicaid program for non-clinical court-ordered urine drug tests, including claims for reimbursement for urine drug tests that violated the Anti-Kickback Statute, either because Defendants offered a kickback, bribe, or rebate to the Cabinet for referring or arranging to refer clients to Defendants for urine drug tests or because Defendants routinely waived required copayments.

134.    Defendants presented, or caused to be presented, the false or fraudulent claims knowing of their falsity, in reckless disregard for their falsity, or with a deliberate indifference to their falsity.

135.    As a result of Defendants' fraudulent actions and conduct, the United States has been harmed in an amount to be proven at trial.

B.     **Count II: Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).**

136.    Defendants knowingly made, used, or caused to be made or used, false records or statements material to their false or fraudulent claims—including, but not limited to, claims submission documents seeking reimbursement for the false claims—to obtain payment for the false or fraudulent claims.

137.    The subject false records or statements were material to the false or fraudulent claims because, without them, (a) Defendants could not have submitted claims for reimbursement for services otherwise not covered by or subject to reimbursement from the Kentucky Medicaid program; and (b) Defendants would not have received the millions of dollars in reimbursements for the false or fraudulent claims.

138.    As a result of Defendants' fraudulent actions and conduct, the United States has been harmed in an amount to be proven at trial.

**C.      Count III: Violation of the False Claims Act, 31 U.S.C. 3729(a)(1)(C).**

139.    Defendants conspired to commit violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and (B); that is, Defendants conspired to present, or cause to be presented, false or fraudulent claims for payment and Defendants conspired to make or use, or cause to be made or used, false record or statements in order to present, or cause to be presented, the false or fraudulent claims.

140.    BATS, Crossroads, and Waters took overt acts to conspire with each other and with Biotap to submit, or cause BATS, Crossroads, and Biotap to submit, false or fraudulent claims to the Kentucky Medicaid program (and, in turn, to the United States) for non-clinical court-ordered urine drug tests, including claims for reimbursement for urine drug tests that violated the Anti-Kickback Statute, either because Defendants offered a kickback, bribe, or rebate to the Cabinet for referring or arranging to refer clients to Defendants for urine drug tests or because Defendants routinely waived required copayments.

141.    As a result of Defendants' fraudulent actions and conduct, the United States has been harmed in an amount to be proven at trial.

**VI.    Prayer for Relief.**

Wherefore, the United States of America, *ex rel.* Nam Nguyen and Misty Nall, requests that it be awarded the following relief against the Defendants, Blue Waters Assessment & Testing Services, LLC, Crossroads Counseling Services, Inc., David Waters, and VerraLab JA, LLC, d/b/a BIOTAP MEDICAL:

A.      a trial by jury;

B.      a judgment against all Defendants on all claims asserted in this Complaint;

C.      damages, trebled as required by the False Claims Act, for the harm and injury sustained by the United States;

D.      an award to the Relators, Nam Nguyen and Misty Nall, from the recovery of the United States as authorized by the False Claims Act;

E.      reasonable attorneys' fees, costs, and expenses of undersigned counsel for the Relators, Nam Nguyen and Misty Nall, incurred in prosecuting this action as authorized by the False Claims Act;

F.      pre- and post-judgment interest; and

G.      any and all other relief to which the United States and the Relators, Nam Nguyen and Misty Nall, may be entitled.

## VII.    **Jury Demand.**

The United States of America, *ex rel.* Nam Nguyen and Misty Nall, pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands a trial by jury on all issues raised in this Complaint.

Respectfully submitted,

**/s/ Matthew T. Lockaby**
Matthew T. Lockaby
Tamara J. Patterson
Lockaby PLLC
1795 Alysheba Way, Suite 4207
Lexington, Kentucky 40509
Tele:   859.263.7884
Fax:    844.270.3044
Email: mlockaby@lockabylaw.com
          tpatterson@lockabylaw.com

*Counsel for Plaintiffs*